# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR.

|  |  |
|---|---|
| OM MATERIALS (SARAWAK) SDN BHD <br><br>             Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>             Defendant. <br><br>       and <br><br> CC METALS AND ALLOYS, LLC AND FERROGLOBE USA, INC. <br><br>       Defendant-Intervenors. | Court No. 25-00130 <br><br><br> **NON-CONFIDENTIAL VERSION** <br><br> **Business Proprietary Information Contained in Brackets ("[]") and Removed From Pages 12 and 48-49** |

## PLAINTIFF'S RULE 56.2 MEMORANDUM OF LAW IN SUPPORT OF

## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Christine M. Streatfeild
Justin R. Becker
Lauren Shapiro

**Baker & McKenzie LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Plaintiff OM Materials (Sarawak) Sdn. Bhd.*

December 17, 2025

# **TABLE OF CONTENTS**

I.    RULE 56.2 STATEMENT .................................................................................1

   A.   Administrative Determination to Be Reviewed ............................................1

   B.   Issues Presented and Summary of Argument ................................................2

II.   STATEMENT OF FACTS ...............................................................................5

III.  STANDARD OF REVIEW.............................................................................22

IV.   ARGUMENT..................................................................................................24

   A.   Commerce's Decision to Countervail Capital Allowances on Income Tax
under the IBA Program Was Not Supported By Substantial Evidence or In
Accordance With Law ...................................................................................25

     1.   Commerce's Determination That the IBA Program Was *De Facto* Specific
Was Not Supported By Substantial Evidence.................................................25

     2.   Commerce's Application of AFA to Find the IBA Program *De Facto*
Specific Was Legally Flawed .......................................................................28

   B.   Commerce's Decision to Countervail the Sarawak Government Land Tax
Program Was Not Supported By Substantial Evidence or In Accordance With
Law ...............................................................................................................36

     1.   Commerce Misinterpreted and Ignored Record Evidence When It
Determined to Apply the Incorrect Analytical Framework to Assess the
Alleged Benefit Conferred By the Sarawak Government Land Tax ...............36

     2.   Commerce Relied on An Unlawful Benchmark When Measuring the
Adequacy of Remuneration .........................................................................45

   C.   Commerce's Decision to Countervail the Import Duty Exemption for
Imported Raw Materials Under the LMW Program Was Not Supported By
Substantial Evidence.....................................................................................49

     1.   Applicable Legal Standards ......................................................................50

     2.   Commerce's Decision to Countervail the Import Duty Exemption for
Imported Raw Materials Under the LMW Program Was Unlawful.................51

V.    CONCLUSION ..............................................................................................55

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altx, Inc. v. United States,*
   167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001).......................................................24

*Atlantic Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984) ................................................................23, 42

*Chemours Company FC, LLC v. United States,*
   443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020).....................................................23

*Clearon Corp. v. United States,*
   359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019).....................................................24

*CS Wind Malaysia Sdn. Bhd. v. United States,*
   Slip Op. 25-149, Ct. No. 24-00079 (Ct. Int'l Trade Dec. 5, 2025)....................47

*Gerber Food (Yunnan) Co. v. United States,*
   387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005)................................................29, 42

*In re NuVasive, Inc,*
   842 F.3d 1376, 1382 (Fed. Cir. 2016) ..............................................................24

*Nippon Steel Corp. v. United States,*
   337 F.3d 1373 (Fed. Cir. 2003) ................................................................23, 30

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States,*
   273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017).....................................................46

*Saha Thai Steel Pipe Pub. Co. v. United States,*
   605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022).....................................................44

*Shelter Forest International Acquisition, Inc. v. United States,*
   2022 WL 2155965 (Fed. Cir. Jun. 15, 2022).....................................................44

*Sigma Corp. v. United States,*
   841 F. Supp. 1255 (Ct. Int'l Trade 1993)..........................................................44

*Tic. Ltd. Sti. v. United States*,
    273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017).......................................46

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951).................................................................23

*Zhejiang Dunan Hetian Metal Co., Ltd. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) ...............................................29, 42

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................23

19 U.S.C. § 1677(5) ...................................................................25

19 U.S.C. § 1677(5)(B)................................................................45

19 U.S.C. § 1677(5)(D)................................................................24

19 U.S.C. § 1677(5)(E)................................................................24

19 U.S.C. § 1677(5A) ..............................................................2, 24, 25

19 U.S.C. § 1677(5A)(D)(i)...........................................................26

19 U.S.C. § 1677(5A)(D)(iii).........................................................26

19 U.S.C. § 1677e(a)............................................................24, 28, 29

19 U.S.C. § 1677e(b) .............................................................4, 24, 29

19 U.S.C. § 1677e(b)(1)............................................................29, 34

19 U.S.C. § 1677m(c)(1).............................................................29

19 U.S.C. § 1677m(d)...........................................................28, 43, 44

19 U.S.C. § 1677m(e).............................................................29, 41

19 U.S.C. § 1677m(e)(1).............................................................41

19 U.S.C. § 1677m(e)(2).............................................................41

19 U.S.C. § 1677m(e)(3).............................................................41

19 U.S.C. § 1677m(e)(4) ................................................................................41

19 U.S.C. § 1677m(e)(5) ................................................................................41

**Regulations**

19 C.F.R. § 351.502 ...............................................................................24, 25

19 C.F.R. § 351.509 .................................................................................4, 14

19 C.F.R. § 351.509(a) ..................................................................................45

19 C.F.R. § 351.511 ...........................................................................4, 18, 45

19 C.F.R. § 351.511(a)(2)(i) ...........................................................4, 45, 47, 48

19 C.F.R. § 351.519 ......................................................................................50

19 C.F.R. § 351.519(a)(1)(ii) ........................................................................50

19 C.F.R. § 351.519(a)(4)(i) .....................................................................50, 51

19 C.F.R. § 351.519(a)(4)(ii) ....................................................................50, 51

**Administrative Determinations**

*Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce, May 20, 2025) ...............................................................................................1

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 31,133 (Dep't of Commerce, Apr. 24, 2024) ......................................6

*Ferrosilicon from Malaysia: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 14,075 (Dep't of Commerce, Mar. 28, 2025)................................................................................1

*Ferrosilicon From Malaysia: Preliminary Affirmative Countervailing
Duty Determination, Preliminary Affirmative Critical
Circumstances Determination, in Part, and Alignment of Final
Determination with Final Antidumping Duty Determination*, 89
Fed. Reg. 73,364 (Dep't of Commerce, Sept. 10, 2024).....................................17

# I.    RULE 56.2 STATEMENT

## A. Administrative Determination to Be Reviewed

This action seeks judicial review of the Final Determination issued by

Commerce in the countervailing duty ("CVD") investigation of ferrosilicon from

Malaysia (Case No. C-557-829).  The period of investigation ("POI") was January

1, 2023, through December 31, 2023.  Notice of the final determination was

published in the *Federal Register* on March 28, 2025.  *See Ferrosilicon from*

*Malaysia: Final Affirmative Countervailing Duty Determination and Final*

*Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 14,075

(Dep't of Commerce, Mar. 28, 2025) ("Final Determination"), P.R. 316; *see also*

accompanying *Issues and Decision Memorandum for the Final Affirmative*

*Determination in the Countervailing Duty Investigation of Ferrosilicon from*

*Malaysia,* Case No. C-557-829 (Mar. 21, 2025) ("Final IDM"), P.R. 308.

Commerce published the Order, based on the Final Determination, in the *Federal*

*Register* on May 20, 2025.  *See Ferrosilicon From Kazakhstan: Amended Final*

*Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and*

*Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce,

May 20, 2025) ("Order"), P.R. 322.

## B. Issues Presented and Summary of Argument

1. **Did Commerce lawfully determine that capital allowances on income tax under the Industrial Building Allowance ("IBA") were *de facto* specific, and therefore countervailable, in spite of a complete record showing that the program was neither *de jure* nor *de facto* specific?**

No.  Commerce unlawfully relied on adverse inferences to find that the IBA program was *de facto* specific.  In doing so, Commerce disregarded information on the record, misunderstood the Government of Malaysia's ("GOM") responses to Commerce's questions, and misapplied the statutory standards for adverse facts available ("AFA").

Commerce's decision to apply AFA to determine that the IBA program was *de facto* specific was unlawful for multiple reasons.  <u>First</u>, the record contained information demonstrating that the IBA program was plainly not specific under 19 U.S.C. § 1677(5A).  In particular, the record contained ample information showing the IBA program was broadly available to all operators of industrial buildings that incurred qualifying building expenditures ("QBE") in Malaysia.  The record also clearly demonstrated that: (1) eligibility was automatic for qualifying industrial building operators; (2) the GOM lacked discretion to reject qualifying entities from claiming the allowance, or to favor any entities over others; and (3) the IBA was a self-claimed allowance for which there was no application or approval process.  To reach its specificity determination, Commerce ignored this record evidence.

2

<u>Second</u>, Commerce incorrectly determined that the GOM failed to provide certain requested information in connection with its specificity analysis. Commerce claimed that the GOM failed to provide a table with information regarding the number of IBA recipient companies and industries and the amount "approved" under the IBA program. However, such a table did not and could not exist, because there was no "approval" process for the IBA program at all. The GOM also responded to Commerce's questions as to whether a separate tax filing database referred to in the GOM's submissions would contain information relevant to the IBA program, and explained why that database would not contain such information. In short, the record contained fulsome responses from the GOM to Commerce's questions about the IBA program. While Commerce should have relied on this information to find that the IBA program was not specific, instead it ignored or misunderstood this information.

<u>Third</u>, even if the requested information regarding the IBA was not on the record (which it was), Commerce's application of AFA to find that the IBA program was *de facto* specific was still legally flawed. In the Final Determination, Commerce applied AFA without specifically confirming that the GOM had not acted to the best of its ability to comply with Commerce's requests for information about the IBA program. And in fact, the GOM <u>did</u> act to the best of its ability to

comply with Commerce's requests.  Therefore, Commerce applied AFA in

violation of its statutory obligations under 19 U.S.C. § 1677e(b).

> **2. Was Commerce's determination that the alleged Sarawak Government land tax program was countervailable supported by substantial evidence and in accordance with law?**

No.  Commerce's determination that the alleged Sarawak Government land

tax program was countervailable was based on a misinterpretation of the record.

Commerce treated this alleged land tax program as rental payments for land-use

rights instead of a direct tax and therefore applied the incorrect analytical

framework for the program.  Specifically, Commerce analyzed the program as a

less-than-adequate-remuneration ("LTAR") program under 19 C.F.R. § 351.511,

when it should have analyzed the program as a direct tax program under 19 C.F.R.

§ 351.509.  Had Commerce analyzed the program under 19 C.F.R. § 351.509, it

could not have determined that the program conferred a benefit on OMSA.

Moreover, even if Commerce's use of the LTAR analytical framework for

the Sarawak Government land tax program was appropriate (which it was not), the

benchmark that Commerce used to calculate OMSA's benefit was unreasonable

because it included distortive pricing that did not align with OMSA's experience.

Therefore, this benchmark was unlawful under 19 C.F.R. § 351.511(a)(2)(i).

Furthermore, Commerce's benefit calculations using this inappropriate benchmark

included errors, further demonstrating significant flaws in Commerce's findings with respect to this alleged program.

### 3. Was Commerce's determination that the duty exemptions for imported raw materials under the Licensed Manufacturing Warehouse ("LMW") program were countervailable supported by substantial evidence and in accordance with law?

No. Commerce determined that the LMW raw materials duty exemption program was countervailable because it wrongly found that the GOM had not demonstrated that it had in place and applies a reasonable and effective system to confirm which inputs, and in what amounts, are consumed in the production of exported product. This determination ignored information submitted by the GOM and OMSA (including information from OMSA that Commerce verified) showing that such a system was in place. Therefore, Commerce's decision to countervail this program was unsupported by substantial evidence and otherwise unlawful.

## II.    STATEMENT OF FACTS

On March 28, 2024, CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively "Petitioners") filed a petition for antidumping duty ("AD") and CVD measures on imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia. *See Ferrosilicon from Brazil, Malaysia, the Republic of Kazakhstan, and the Russian Federation: Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930,*

5

*as Amended, on Behalf of CC Metals and Alloys, LLC and Ferroglobe USA, Inc*.,
Case Nos. A-351-860, A-834-812, A-557-828, A-821-838, C-351-861, C-834-813,
C-557-829, and C-821-839 (Mar. 28, 2024), C.R. 1-8, P.R. 1-8.

Commerce initiated CVD investigations with respect to ferrosilicon from
Brazil, Kazakhstan, Malaysia, and Russia on April 17, 2024.  *See Ferrosilicon
from Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of
Countervailing Duty Investigations*, 89 Fed. Reg. 31,133 (Dep't of Commerce,
Apr. 24, 2024), P.R. 28.  For Malaysia, Commerce initiated an investigation into
13 different programs that were alleged by Petitioners.  Ultimately, by the end of
the investigation, Commerce reviewed a total of 18 programs.

On May 3, 2024, Commerce selected OMSA and Pertama Ferroalloys Sdn.
Bhd ("Pertama") as the mandatory respondents in its CVD investigation.  *See*
Memorandum from Suresh Maniam, Senior International Trade Compliance
Analyst, Office I, AD/CVD Operations, to Scot Fullerton, Associate Deputy
Assistant Secretary for AD/CVD Operations, *Countervailing Duty Investigation of
Ferrosilicon from Malaysia: Respondent Selection*, Case No. C-557-829 (May 3,
2024), C.R. 14, P.R. 36.

Commerce then conducted an individual investigation of OMSA during
which OMSA submitted responses to all questionnaires issued and other relevant
information required by Commerce.  *See* Letter from Baker McKenzie LLP to the

Hon. Gina Raimondo, *Section III Response Part 1*, Case No. C-557-829 (Jun. 18, 2024) ("OMSA IQR1"), C.R. 49-82, P.R. 85-99; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Section III Response Part 2*, Case No. C-557-829 (Jun. 21, 2024) ("OMSA IQR2"), C.R. 83-98, P.R. 116; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Affiliation Supplemental Questionnaire*, Case No. C-557-829 (Jun. 28, 2024) ("Affiliation SQR"), C.R. 123, P.R. 128; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Second Supplemental Questionnaire Response*, Case No. C-557-829 (Jul. 17, 2024) ("OMSA SQR2 Part 1"), C.R. 132-133, P.R. 160; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Second Supplemental Questionnaire Response Part 2*, Case No. C-557-829 (Jul. 23, 2024) ("OMSA SQR2 Part 2"), C.R. 176-177, P.R. 176; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Third Supplemental Questionnaire Response*, Case No. C-557-829 (Aug. 9, 2024) ("OMSA SQR3"), C.R. 182, P.R. 189; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Fourth Supplemental Questionnaire Response*, Case No. C-557-829 (Aug. 15, 2024) ("OMSA SQR4"), C.R. 188-191, P.R. 198; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Fifth Supplemental Questionnaire*, Case No. C-557-829 (Aug. 23, 2024) ("OMSA SQR5"), C.R. 212-213, P.R. 214; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *OMSA's Rebuttal Benchmark Submission*, Case No. C-557-829 (Aug. 27, 2024)

("OMSA Rebuttal Benchmark Submission"), P.R. 218-220; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Sixth Supplemental Questionnaire Response*, Case No. C-557-829 (Aug. 29, 2024) ("OMSA SQR6"), C.R. 224-227, P.R. 228; Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, *Seventh Supplemental Questionnaire Response*, Case No. C-557-829 (Aug. 30, 2024) ("OMSA SQR7"), C.R. 229-234, P.R. 231.

The GOM also submitted information regarding the alleged subsidy programs.  *See* Letter from the Government of Malaysia to the Hon. Gina Raimondo, *Countervailing Duty Investigation of Ferrosilicon from Malaysia: Submission of Questionnaire Responses from the Government of Malaysia*, Case No. C-557-829 (Jun. 19, 2024) ("GOM IQR1"), P.R. 100; Letter from the Government of Malaysia to the Hon. Gina Raimondo, *Countervailing Duty Investigation of Ferrosilicon from Malaysia: Submission of Questionnaire Responses from the Government of Malaysia*, Case No. C-557-829 (Jun. 25, 2024) ("GOM IQR2"), C.R. 117-121, P.R. 120-125; Letter from the Government of Malaysia to the Hon. Gina Raimondo, *Countervailing Duty Investigation of Ferrosilicon from Malaysia: Submission of Supplemental Questionnaire Responses from the Government of Malaysia*, Case No. C-557-829 (Jul. 16, 2024) ("GOM SQR1"), P.R. 140-158; Letter from the Government of Malaysia to the Hon. Gina Raimondo, *Countervailing Duty Investigation on Ferrosilicone from Malaysia:*

*Submission of Supplemental Questionnaire Responses from the Government of Malaysia*, Case No. C-557-829 (Aug. 15, 2024) ("GOM SQR2"), P.R. 199; Letter from the Government of Malaysia to the Hon. Gina Raimondo, *Countervailing Duty Investigation on Ferrosilicone from Malaysia: Submission of New Subsidy Questionnaire Responses from the Government of Malaysia*, Case No. C-557-829 (Aug. 20, 2024) ("GOM NSQR"), P.R. 206; Letter from the Government of Malaysia to the Hon. Gina Raimondo, *Countervailing Duty Investigation on Ferrosilicone from Malaysia: Submission of Third Supplemental Questionnaire Responses from the Government of Malaysia*, Case No. C-557-829 (Aug. 23, 2024) ("GOM SQR3"), C.R. 211, P.R. 213; Letter from the Government of Malaysia to the Hon. Gina Raimondo, *Countervailing Duty Investigation on Ferrosilicone from Malaysia: Submission of Fourth Supplemental Questionnaire Responses from the Government of Malaysia*, Case No. C-557-829 (Sept. 23, 2024) ("GOM SQR4"), P.R. 256-258; Letter from the Government of Malaysia to the Hon. Gina Raimondo, *Countervailing Duty Investigation on Ferrosilicone from Malaysia: Submission of Fifth Supplemental Questionnaire Responses from the Government of Malaysia*, Case No. C-557-829 (Oct. 1, 2024) ("GOM SQR5"), C.R. 246, P.R. 266.

These submissions to Commerce included information regarding all of the alleged programs, including those related to the IBA, the Sarawak Government

land tax, and the LMW imported raw material duty exemption programs.  The

submissions included an explanation of each alleged program, a description of the

eligibility criteria for each alleged program, and disclosure of whether and how

OMSA and Pertama may have used the alleged programs.

For the IBA program, OMSA and the GOM provided information showing

that the IBA is broadly available, irrespective of the industry to which a company

belongs, the region in which it operates, and whether the company exports its

products.  *See* GOM IQR1, at 66-73, P.R. 100; *see also* OMSA IQR2, at Exhibit

IBA SQA-1, Exhibit IBA SQA-2, and Exhibit IBA ITA-1 through ITA-5, C.R. 83-

98, P.R. 116.  As OMSA explained, the IBA program allows any owner/operator

of an industrial building to claim capital allowances on their reported income taxes

for QBEs "incurred on the construction or purchase of a building which {is} used

at any time after its construction or purchase, as the case may be, as an industrial

building."  OMSA IQR2, at Exhibit IBA SQA-1, at 1, C.R. 83-98, P.R. 116.  QBEs

can include a wide range of expenditures related to building construction,

modification, expansion, renovation, or purchase.  *See* OMSA IQR2, at Exhibit

IBA SQA-1, at 1, C.R. 83-98, P.R. 116.  The only criteria for IBA eligibility

involve: (1) the claimant's status as the building owner/operator; (2) the building's

use as an industrial building.  *See* OMSA IQR2, at Exhibit IBA SQA-1, at 1, C.R.

83-98, P.R. 116.  Therefore, the IBA program was in no way contingent on the

claimant's export activities, industry, or region.  *See* OMSA IQR2, at Exhibit IBA SQA-1, at 1, C.R. 83-98, P.R. 116; *see also* GOM IQR1, at 69-71, P.R. 100. Information submitted by Pertama further supported these conclusions.  *See* Letter from White & Case LLP to the Hon. Gina Raimondo, *Countervailing Duty Investigation of Ferrosilicon from Malaysia: Response to the "Program-Specific" Questions Portion of Section III of the Countervailing Duty Questionnaire*, Case No. C-557-829 (Jun. 21, 2024), at 10-11, C.R. 103-116, P.R. 120 ("Pertama Program-Specific IQR").

Moreover, as OMSA, Pertama, and the GOM explained, owners/operators of industrial buildings can claim IBA allowances without application or approval. *See* OMSA IQR2, at Exhibit IBA SQA-1, at 2, C.R. 83-98, P.R. 116; *see also* GOM IQR1, at 69, P.R. 100; *see also* Pertama Program-Specific IQR, at 11, C.R. 103-116, P.R. 120.  OMSA also explained that the GOM may verify the capital allowances claimed on the reported income taxes through a tax audit, but the use of the program was not monitored in any other way.  *See* OMSA IQR2, at Exhibit IBA SQA-1, at 2, C.R. 83-98, P.R. 116.  Importantly, the GOM lacks discretion to disallow an entity that fulfills the IBA program's eligibility criteria from claiming and receiving the allowance.  *See* GOM IQR1, at 70-71, P.R. 100.  Finally, OMSA provided its tax returns and schedules of its capital allowance computations in support of its reported use of the alleged IBA program.  *See* OMSA IQR2, at

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

Exhibit IBA SQA-1, at 2 and Exhibit IBA ITA-2, C.R. 83-98, P.R. 116; *see also*

OMSA IQR1, at Exhibit GEN-14, C.R. 49-82, P.R. 85-99.

For payments related to land held in Sarawak, OMSA, Pertama, and the

GOM provided information, including relevant legal authorities, that demonstrated

the "land rent" charged by the Sarawak Government was actually a property tax

and not rent.  The parties' submissions explained that the Sarawak Government had

granted OMSA and Pertama long-term leaseholds and required the parties to pay

both initial premiums and an annual "quit rent" payment on the land in order to

maintain their land-use rights.  *See* OMSA IQR1, at Exhibit LAND-1 through

Exhibit LAND-8, C.R. 49-82, P.R. 85-99; *see also* Pertama Program-Specific IQR,

at Exhibit LAND-1 to LAND-19, C.R. 103-116, P.R. 120; GOM IQR2 at 17-19,

C.R. 117-121, P.R. 120-125; GOM SQR1 at 12, P.R. 140-158.  In OMSA's case, it

received a [          ] lease and was required to pay its initial premium for land-

use rights to the Sarawak Government in [      ] installments.  *See* OMSA IQR1, at

Exhibit LAND-1 to Exhibit LAND-3, C.R. 49-82, P.R. 85-99.  Ultimately, OMSA

received a waiver for its [

                                                                    ].  OMSA

IQR1, at Exhibit LAND-1 and Exhibit LAND-5, C.R. 49-82, P.R. 85-99.  The

original terms of the lease provided for this potential waiver.  *See* OMSA IQR1, at

Exhibit LAND-1 and Exhibit LAND-2, C.R. 49-82, P.R. 85-99.

As noted above, OMSA was also required to pay annual "quit rent" on the land, in accordance with rates established pursuant to the Sarawak Land Code. *See* OMSA IQR1, at Exhibit LAND-2, C.R. 49-82, P.R. 85-99. The parties' submissions demonstrated that these rates—which applied on a consistent, state-wide basis throughout Sarawak to all land title holders (with limited exceptions)— were established by the Sarawak Government in accordance with Section 30(5) of the Sarawak Land Code and pursuant to official, published determinations. *See* GOM IQR2, at 17-19, C.R. 117-121, P.R. 120-125; *see also* GOM SQR3 at 5, C.R. 211, P.R. 213. The GOM also explained that the rates were not set by negotiations between the Sarawak Government and OMSA or any other land-holding party in Sarawak. *See* GOM SQR3, at 5, C.R. 211, P.R. 213. Pertama also submitted a definition of "quit rent," a translation of the Malay term for "quit rent" (*cukai tanah*), and materials from the Malaysian and Sarawak Governments showing that "quit rent" was a distinct type of property tax. *See* Letter from White & Case LLP to the Hon. Gina Raimondo, *Clarification Factual Information*, Case No. C-557-829, dated Aug. 27, 2024 ("Pertama's Land Submission") at 4-6, C.R. 220-222, P.R. 223-225. OMSA also submitted information that corroborated the quit rent definition, with specific acknowledgment that the land rent imposed in the Malaysian states was a land tax. *See* OMSA Rebuttal Benchmark Submission, at Exhibit BENCH-6, P.R. 218-220. The information submitted by both respondents

thus demonstrated that the "quit rent" payments were tax payments, not rental payments.

In addition to the information described above, OMSA provided documentation and details with respect to its own particular "quit rent" payments, and outlined how these tax payments were in accordance with the Sarawak Land Code. *See* OMSA IQR1, at Exhibit LAND-1 and Exhibit LAND-4 through Exhibit LAND-6, C.R. 49-82, P.R. 85-99. The record showed that OMSA paid the tax owed in full. *See* OMSA IQR1, at Exhibit LAND-1, Exhibit LAND-2, and Exhibit LAND-4, C.R. 49-82, P.R. 85-99.

In sum, the record demonstrated that: (1) Commerce should analyze the Sarawak Government land tax as a direct tax under 19 C.F.R. § 351.509; and (2) under that analytical framework, OMSA did not receive any countervailable benefits in connection with this land tax, because it paid the tax owed in full.

OMSA also submitted relevant benchmark information to calculate a benefit for the Sarawak Government land tax program in the event that Commerce disagreed with the position that the land rent was a tax and not a provision of a good. Specifically, OMSA submitted excerpts from the 2023 edition of the Malaysian Investment Development Authority's Malaysia Cost of Doing Business publication ("MIDA"), which included an annual "quit rent" amount for industrial land in Sarawak on country land. *See* OMSA Rebuttal Benchmark Submission, at

Exhibit BENCH-5, P.R. 218-220.  OMSA explained that the quit rent rates

reported in MIDA were imposed on land, and thus served as the most comparable

benchmark.  This information further supported a finding that OMSA and Pertama

did not benefit from any land tax exemption or reduction.

For imported raw material duty exemptions under the LMW program,

OMSA and the GOM submitted information detailing the program and the system

used to confirm what and how much of each input was consumed in the production

of an exported product to affirm eligibility for the exemption.  As OMSA

explained, to benefit from these duty exemptions, Malaysian companies must

apply for and receive approval through the LMW program and must seek renewal

of their approval every two years.  *See* OMSA IQR2, at Exhibit Import Duty SQA-

1 and Exhibits Import Duty SQA-3 through SQA-7, C.R. 83-98, P.R. 116.  In each

renewal application, the applicant was required to submit certain information,

including: (1) a schedule of the quantities and values of imported raw materials and

inputs consumed and finished goods produced at the LMW facility in the year prior

to the renewal application; (2) identification of the finished goods sold both

domestically and for export in the year prior to the renewal application; and (3)

lists of specific raw materials, inputs, and finished goods proposed to be covered

by the duty exemption program.  *See* OMSA IQR2, at Exhibit Import Duty SQA-1,

at 3-4 and Exhibits Import Duty SQA-3 through SQA-7, C.R. 83-98, P.R. 116.

Each month after approval of an application (whether an initial or renewal application), the licensee is also required to prepare and submit a monthly accounting, using an independent auditor, of all: (1) materials and inputs imported under the program; and (2) finished goods (*i.e.*, ferrosilicon) exported under the program.  *See* OMSA IQR2, at Exhibit Import Duty SQA-1, at 4, 5-6 and Exhibit Import Duty SQA-15, C.R. 83-98, P.R. 116.  The licensee is also required to prepare and submit an annual, audited report with such information.  *See* OMSA IQR2, at Exhibit Import Duty SQA-1, at 3-4 and Exhibit Import Duty SQA-15, C.R. 83-98, P.R. 116.  These applications and compliance reports provided the GOM with information needed to track the identities and quantities of inputs consumed in the production of exported products.

OMSA also provided documentation and details of its use of the exemptions during periods relevant for this CVD investigation.  These documents included license certificates, applications, and approvals, program requirement details, and independent auditor reports.  *See* OMSA IQR2, at Exhibit Import Duty SQA-2 through Exhibit Import Duty SQA-17, C.R. 83-98, P.R. 116.  OMSA also submitted an example of its official customs import documentation (Form K1) showing imported raw materials for which OMSA claimed the duty exemption. See OMSA SQR2 Part 1, at Exhibit SQ2-7, C.R. 132-133, P.R. 160.  These submissions clearly supported the position that the LMW raw material exemptions

were duty exemptions for inputs used in the production of exported products that could not be found countervailable.

Although the record contained abundant support that proved the IBA, Sarawak Government land tax, and LMW raw material duty and sales tax exemptions were not countervailable programs, Commerce nevertheless found all three programs to be countervailable and calculated subsidy rates for OMSA in its Preliminary Determination published on September 10, 2024. *See Ferrosilicon From Malaysia: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with Final Antidumping Duty Determination*, 89 Fed. Reg. 73,364 (Dep't of Commerce, Sept. 10, 2024) ("Preliminary Determination"), P.R. 242; *see also* accompanying *Decision Memorandum for the Preliminary Affirmative Determination in the Countervailing Duty Investigation of Ferrosilicon from Malaysia*, Case No. C-557-829 (Sept. 3, 2024) ("Preliminary IDM"), P.R. 236.

In its Preliminary Determination, Commerce found the IBA program to be *de facto* specific and therefore countervailable. The *de facto* specificity determination was based entirely on the application of adverse inferences. Commerce applied adverse inferences in response to the GOM's alleged failure to provide a database that would identify all companies that claimed capital

17

allowances under the IBA program.  *See* Preliminary IDM, at 9-10, P.R. 236. However, no such database exists and therefore, the decision rests on a faulty factual premise.

Commerce also found the Sarawak Government land tax program to be countervailable in its Preliminary Determination without consideration as to whether the land rent paid qualified as a tax.  *See* Preliminary IDM, at 15, 21-22, P.R. 236.  As a result, Commerce analyzed this land tax program as the Sarawak Government's provision of a good (land) for LTAR under 19 C.F.R. § 351.511. *See* Preliminary IDM, at 21-22, P.R. 236.[1]  To measure the adequacy of the remuneration that the Sarawak Government received through this program, Commerce compared the mandatory respondents' land tax payments to "industrial property commercial rental rates in Sarawak" as published in the CBRE Market Outlook 2023 Malaysia Real Estate Report.  *See* Preliminary IDM, at 15, P.R. 236. Commerce used these prices published by CBRE as its benchmark, even though they included prices for buildings (*e.g.*, semi-detached buildings in built-up areas), and actual buildings are not comparable to land (*i.e.*, the "product" on which

---

[1]     Commerce did not consider whether the land tax program should be analyzed as a tax program or as an LTAR program in its Preliminary Determination.  It conducted its analysis of the program under the presumption that the land tax was rent that should be analyzed as an LTAR program.  However, Commerce noted in its Preliminary IDM that it would consider information submitted by OMSA and Pertama related to "quit rent" and how it may affect its analysis of the program after the Preliminary Determination.  *See* Preliminary IDM, at 15, P.R. 236.

OMSA pays the land rent). *See* OMSA Rebuttal Benchmark Submission, at 2 and Exhibit BENCH-1 through Exhibit BENCH-5, P.R. 218-220. The prices published by CBRE were not representative of OMSA's experience and therefore constituted an unreasonable benchmark.

With respect to the LMW raw materials duty and sales tax exemption, Commerce found the program to be countervailable because it found that the Government of Malaysia did not demonstrate it had in place and applies a system that is reasonable and effective to confirm which inputs, and in what amounts, are consumed in the production of exported product. *See* Preliminary IDM, at 18-19, P.R. 236.

After issuing the Preliminary Determination, Commerce issued two supplemental questionnaires to the GOM. *See* GOM SQR4, P.R. 256-258; *see also* GOM SQR5, C.R. 246, P.R. 266. In the Fourth Supplemental Questionnaire to the GOM, Commerce inquired about "quit rent" in response to submissions from OMSA and Pertama explaining that the land rent imposed in Sarawak was quit rent, the definition of which is a land tax. *See* GOM SQR4, P.R. 256-258. Specifically, Commerce asked the GOM whether the Government of Sarawak imposed quit rent, and if so, how the rent rates were set and who was subject to them. *See* GOM SQR4, P.R. 256-258. The GOM responded that the land rent established by the Sarawak Land Code was quit rent, and that all land title holders

are subject to the quit rent (with minor exceptions).  *See* GOM SQR4, at 2-4, P.R. 256-258.

Commerce then continued its investigation and conducted on-site verifications of OMSA's and the GOM's responses in the investigation and issued its verification reports on November 22 and 25, 2024.  *See* Memorandum to The File from Suresh Maniam and Stefan Smith, International Trade Analysts, Office I, AD/CVD Operations, *Verification of the Questionnaire Responses of Government of Malaysia*, Case No. C-557-829 (Nov. 22, 2024) ("GOM Verification Report"), C.R. 276, P.R. 278; Memorandum to The File from Suresh Maniam and Stefan Smith, International Trade Analysts, Office I, AD/CVD Operations, *Verification of the Questionnaire Responses of OM Materials (Sarawak) Sdn Bhd*, Case No. C-557-829 (Nov. 25, 2024) ("OMSA Verification Report"), C.R. 278, P.R. 282. During the verification of the GOM's responses, Commerce elected not to verify information related to the IBA, the Sarawak Government land tax, and the LMW programs.  *See generally* GOM Verification Report, C.R. 276, P.R. 278.  In contrast, Commerce verified OMSA's responses with respect to the IBA, the Sarawak Government land tax, and the LMW programs.  *See* OMSA Verification Report, at 8-15, C.R. 278, P.R. 282.

On December 17, 2024, OMSA submitted a case brief, detailing why Commerce's preliminary findings with respect to the IBA, the Sarawak

Government land tax, and the LMW were unsubstantiated and inaccurate, and how the record showed that these three programs were not countervailable.  *See Ferrosilicon from Malaysia: OMSA's Case Brief*, Case No. C-557-829 (Dec. 17, 2024) ("OMSA Case Brief"), C.R. 284, P.R. 291.  In its case brief, OMSA addressed Commerce's misinterpretation of the GOM's responses regarding the IBA program, and in doing so, explained why no database exists that would identify which parties claimed capital allowances under the program.  *See* OMSA Case Brief, at 9, C.R. 284, P.R. 291.  OMSA also synthesized the record documentation which supported the fact that the Sarawak Government land tax is a property tax and not rent for land-use rights.  *See* OMSA Case Brief, at 12-13, C.R. 284, P.R. 291.  Furthermore, OMSA showed how the GOM applied a reasonable and effective tracking system for inputs to monitor duty exemptions for raw materials under the LMW program.  *See* OMSA Case Brief, at 16-20, C.R. 284, P.R. 291.  In addition to its explanations as to why the three programs are not countervailable, OMSA also addressed in the case brief the benchmark used to calculate the benefit for the Sarawak Government land tax program in the event that Commerce continued to find the program to be a rental payment for land-use rights rather than a property tax.  Specifically, OMSA explained why the prices from the CBRE Market Outlook 2023 Malaysia Real Estate Report that Commerce used in its Preliminary Determination were not reflective of OMSA's experience,

and therefore were unreasonable benchmarks.  *See* OMSA Case Brief, at 16-20, C.R. 284, P.R. 291.  OMSA emphasized that Commerce could instead use benchmark data from the 2023 edition of the MIDA, which OMSA had placed on the record.  *See* OMSA Case Brief, at 15, C.R. 284, P.R. 291.

On December 30, 2024, OMSA submitted a rebuttal brief.  *See Ferrosilicon from Malaysia: OMSA's Rebuttal Brief*, Case No. C-557-829 (Dec. 30, 2024) ("OMSA Rebuttal Brief"), C.R. 287, P.R. 295.  In response to Petitioners' arguments with respect to the alleged Sarawak Government land programs, OMSA reiterated that the Sarawak land tax paid was not rent on land-use rights, but rather a property tax.  *See* OMSA Rebuttal Brief, at 8-10, C.R. 287, P.R. 295.

Commerce then issued its Final Determination.  In its Final Determination, Commerce disregarded or rejected OMSA's arguments with respect to the alleged IBA, Sarawak Government land tax, and LMW programs and did not make any changes to its findings from its Preliminary Determination.  *See* Final IDM, at 6-7, P.R. 308.  Commerce therefore continued to find the three programs countervailable.  In doing so, Commerce failed to acknowledge or to afford any weight to, or otherwise disregarded, evidence on the record that detracted from its preliminary findings—evidence which showed that these three programs were not countervailable.

## III.    STANDARD OF REVIEW

This Court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

To satisfy the "substantial evidence" standard, Commerce must take into account "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). And the Court may not sustain Commerce's determination "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951).

In order to satisfy the "substantial evidence" standard, Commerce must also provide a reasoned explanation for its determination. To do so, it must "make the necessary findings and have an adequate evidentiary basis for its findings," which requires "examin{ing} the relevant data and articulat{ing} a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chemours Company FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (citing *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)). Commerce "must address significant arguments and

evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v.*

*United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

To be "in accordance with law," Commerce's determination must comply

with the countervailing duty statute and relevant implementing regulations. These

include authorities governing the types of programs that can be countervailed,

including rules regarding: the specificity of subsidies (19 U.S.C. § 1677(5A) and

19 C.F.R. § 351.502); the identification of a financial contribution associated with

an alleged subsidy; and the calculation of a benefit conferred on the recipient of the

alleged subsidy (19 U.S.C. § 1677(5)(D)-(E) and relevant implementing

regulations).

The rules to which Commerce must adhere also include the statutory criteria

that must be satisfied before Commerce may disregard record information and

apply facts otherwise available ("FA"), and thereafter AFA. *See, e.g.*, *Clearon*

*Corp. v. United States*, 359 F. Supp. 3d 1344, 1357-1360 (Ct. Int'l Trade 2019)

(remanding in part Commerce's final results in the first administrative review of

the CVD order on chlorinated isocyanurates from China, because Commerce

improperly applied FA—and subsequently, AFA—in violation of 19 U.S.C. §

1677e(a)-(b)). Failure to adhere to any of these requirements is fatal to

Commerce's decision.

## IV.    ARGUMENT

**A.      Commerce's Decision to Countervail Capital Allowances on Income Tax under the IBA Program Was Not Supported By Substantial Evidence or In Accordance With Law**

In the following sections, OMSA first discusses the extensive evidence demonstrating that capital allowances on income tax under the IBA program could not be considered specific under 19 U.S.C. § 1677(5A) and 19 C.F.R. § 351.502. As OMSA explains below, Commerce's decision to disregard this evidence was unlawful and cannot stand.  Next, OMSA explains why Commerce's decision to find the IBA program *de facto* specific based entirely on AFA was unlawful, regardless of whether sufficient evidence to find the program not specific was in fact on the record (which it was).

**1.   Commerce's Determination That the IBA Program Was *De Facto* Specific Was Not Supported By Substantial Evidence**

Under the statute, Commerce can only countervail an alleged subsidy program if it determines that that program: (1) involves a financial contribution; (2) confers a benefit on the recipient; and (3) is "specific" within the meaning of 19 U.S.C. § 1677(5A).  *See* 19 U.S.C. § 1677(5).  In general, alleged subsidy programs can fulfill the "specificity" requirement in one of two ways: either they

can be *de jure* specific (*i.e.*, specific as a matter of law), or they can be *de facto*

specific (*i.e.*, specific in practice).

An analysis of whether a subsidy is *de jure* specific focuses on express legal

criteria limiting program eligibility to particular enterprises or industries and/or the

extent to which particular enterprises or industries receive overly favorable access

to the program.  *See* 19 U.S.C. § 1677(5A)(D)(i).  Alleged subsidy programs that

are not *de jure* specific are not countervailable unless they are *de facto* specific.

Under Commerce's regulations, programs are only *de facto* specific if: (1) "{t}he

actual recipients of the subsidy . . . are limited in number"; (2) a particular

"enterprise or industry is a predominant user of the subsidy"; (3) a particular

"enterprise or industry receives a disproportionately large amount of the subsidy";

or (4) the relevant government has administered the program in a manner

indicating "that an enterprise or industry is favored over others."  19 U.S.C.

§ 1677(5A)(D)(iii).

Throughout this investigation, the mandatory respondents and the GOM

demonstrated that the IBA program could not be considered *de jure* or *de facto*

specific.  The parties submitted comprehensive evidence demonstrating that this

program did not fulfill any of the criteria for *de jure* specificity.  *See generally*

GOM IQR1, at 69-70, P.R. 100; *see also* OMSA IQR2, at Exhibits IBA SQA-1

and IBA-SQA-2, C.R. 83-98, P.R. 116; GOM SQR1, at 5-7 and Exhibit 2A, P.R.

140-158. This evidence included, *inter alia*, legal authorities for the program, which clearly provide that <u>any</u> owner/operator of an industrial building can claim capital allowances on their reported income taxes for QBEs incurred on the construction or purchase of an industrial building. *See* OMSA IQR2, at Exhibits IBA SQA-1, at 1 and IBA-SQA-2, C.R. 83-98, P.R. 116; *see also* GOM IQR1, at 69, P.R. 100; GOM SQR1, at 5-7 and Exhibit 2A, P.R. 140-158. The record also demonstrated that there is no application or approval process for the IBA program (*i.e.*, it is a self-claimed allowance), and the GOM lacks discretion to bar qualifying entities from receiving the allowance. *See* GOM IQR1, at 69-71, P.R. 100; *see also* GOM SQR1, at 6-7, P.R. 140-158; OMSA IQR2, at Exhibit IBA-SQA-1 at 2, C.R. 83-98, P.R. 116; Pertama Program-Specific IQR, at 10, C.R. 103-116, P.R. 120. Rather, the GOM can only deny allowances to claimants who do not, in fact, qualify for the IBA program, which the GOM might discover through a tax audit. *See* GOM SQR1, at 6-7, P.R. 140-158 ("Malaysia has implemented self-assessment tax system for company since YA 2001. Tax computation submitted in the ITRF is accepted as deemed assessment, subject to tax audit and investigation."). Petitioners did not dispute any of this information.

The record also reflected the fact that the IBA program did not meet *de facto* specificity criteria, either. In pertinent part, the GOM's lack of discretion to reject qualifying applicants from claiming the allowance showed that the GOM <u>legally</u>

<u>cannot</u> administer the IBA program in a manner that favors a particular enterprise or industry over others.  Moreover, the record was devoid of any evidence suggesting that recipients of the IBA program are limited in number, that a particular industry is the predominant user, or that a particular industry received a disproportionately large amount of the tax benefits.  In the absence of any such evidence, Commerce based its *de facto* specificity finding for the IBA program entirely on AFA.  In the following section, OMSA explains why, in making this finding, Commerce misinterpreted the record, invented a gap in the record that did not exist, and ultimately misused the AFA statute.

### 2. Commerce's Application of AFA to Find the IBA Program *De Facto* Specific Was Legally Flawed

The statute imposes stringent conditions on Commerce's application of FA, and thereafter, AFA.  OMSA first provides an overview of the statutory and regulatory requirements regarding the use of FA and AFA.  Then, OMSA explains why Commerce's application of FA, and thereafter AFA, to find the IBA program *de facto* specific (and thereby countervailable) violated these legal requirements.

### a. Legal Standards for Applying FA

Under section 1677e(a) of the statute, Commerce may (subject to 19 U.S.C. § 1677m(d)) resort to FA in making its determination only under the following conditions: (1) necessary information is not available on the record; or (2) a

respondent has (i) withheld requested information, (ii) failed to provide requested information by the established deadlines or in the form and manner requested (subject to 19 U.S.C. §§ 1677m(c)(1) and (e)), (iii) significantly impeded the proceeding, or (iv) provided unverifiable information.  *See* 19 U.S.C. § 1677e(a).

Importantly, the U.S. Court of Appeals for the Federal Circuit ("CAFC") has stated that, "under the plain language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record." *Zhejiang Dunan Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011).  In other words, Commerce may not apply FA "in disregard of information of record that is not missing or otherwise deficient." *Zhejiang Dunan Hetian Metal Co*., 652 F.3d at 1348 (*quoting Gerber Food (Yunnan) Co. v. United States*, 387 F. Supp. 2d 1270, 1288 (Ct. Int'l Trade 2005)).

### b.  Legal Standards for Applying AFA

Before Commerce can consider applying AFA, it must first determine that conditions warranting the application of FA have been satisfied.  *See Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1346.  The conditions prescribed by 19 U.S.C. § 1677e(a) therefore are necessary, but not sufficient, for Commerce to apply AFA.  However, section 1677e(b) of the statute imposes additional conditions before Commerce can apply AFA.  Specifically, under 19 U.S.C. § 1677e(b)(1), Commerce may only apply AFA if it additionally determines that a

respondent "failed to cooperate by not acting to the best of its ability to comply

with a request for information."  As the CAFC has recognized, the "best of its

ability" standard requires a respondent to put forth its maximum efforts, but it

"does not require perfection."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373,

1382 (Fed. Cir. 2003).

### 3. Commerce Misinterpreted the Record in Determining that the GOM Had Withheld Information

In the Final Determination, Commerce continued to find that the GOM

withheld information related to the IBA program, and thus necessary information

related to this program was missing from the record.  *See* Final IDM, at 14-15, P.R.

308.  Commerce determined that it could apply FA on these bases.  *See* Final IDM,

at 15, P.R. 308.

These findings were plainly unwarranted on the facts.  Commerce arrived at

these conclusions because the GOM had not submitted a table with certain

information about the companies and industries "approved" to use the IBA

program and the amount of allowances "approved" under the program, which

Commerce had requested in questionnaires issued to the GOM.  *See* GOM IQR1,

at 71-72, P.R. 100; *see also* GOM SQR1, at 7, P.R. 140-158.  Specifically, in

response to Commerce's request for such a table, the GOM had stated that the

request was "Not Applicable."  *See* GOM IQR1, at 71-72, P.R. 100; *see also* GOM

SQR1, at 7, P.R. 140-158.  Commerce improperly interpreted this response as a refusal to provide the requested information.

Contrary to Commerce's view, the record demonstrates that the GOM responded "Not Applicable" to this request because the question was, in fact, not applicable.  As explained above, tax filers in Malaysia can self-claim the IBA capital allowances, and will automatically receive those allowances, if they meet the eligibility criteria provided for by law.  *See* GOM SQR1, at 6-7, , P.R. 140-158; *see also* OMSA IQR2, at Exhibit IBA SQA-1, at 2, C.R. 83-98, P.R. 116.  In other words, the GOM could not provide information on the companies, industries, and/or amounts "approved" under the IBA program, because this program does not involve an "approval" process at all.  The lack of an "approval" process for the IBA program was an uncontroverted fact on the record, and a fact that the GOM repeatedly emphasized in its responses to Commerce.  *See* GOM SQR1, at 7, P.R. 140-158.  Therefore, the GOM's response of "Not Applicable" to a request for statistics regarding "approvals" under the program was fulsome.

Beyond the fact that the GOM could not, by definition, provide statistics regarding "approvals" under the IBA program, the GOM also explained why a breakdown of the specific IBA recipients and amounts received was not reportable.  In a supplemental questionnaire response, the GOM explained:

> The claim for Schedule 3 ITA 1967 allowance consists of allowances of qualifying plant expenditure (Capital Allowance (CA)) and qualifying building allowance (Industrial Building Allowance (IBA)). There is no requirement to segregate CA and IBA in the Income Tax Return Form (ITRF). The amount is to be specified in Part C: C1a. It is not possible for IRBM to separate IBA claims without conducting a tax audit.

GOM SQR1, at 6, P.R. 140-158. In other words, the GOM possesses aggregated usage data for the CA and IBA tax allowances but does not possess—and cannot construct—segregated data regarding all companies' and industries' usage of the IBA program. The GOM only obtains insight into IBA usage for specific entities if it conducts a tax audit. This is another reason why the GOM's response of "Not Applicable" to a request for IBA-specific usage data was proper and complete.

The GOM's explanation that it does not possess segregated data on IBA usage also addresses Commerce's concerns about a database mentioned by the GOM in its responses. In its initial questionnaire response, the GOM stated that it maintains a database of companies' Income Tax Return Forms ("ITRF"), because electronic filing of tax returns is mandatory in Malaysia. *See* GOM IQR1, at 68, P.R. 100. In its supplemental questionnaire to the GOM, Commerce asked if this database would include IBA-specific usage information. GOM SQR1, at 7, P.R. 140-158. By expressly submitting that "{i}t is not possible for IRBM to separate IBA claims without conducting a tax audit," the GOM put to bed Commerce's

belief that the GOM's tax filing database would include a breakdown of the specific IBA recipients and amounts received. *See* GOM SQR1, at 6, P.R. 140-158.

However, in the Final Determination, Commerce again faulted the GOM for responding "Not Applicable" to the questions regarding *de facto* specificity despite its possession of this tax filing database. *See* Final IDM, at 15, P.R. 308. Commerce thus continued to ignore the GOM's explanations for the information it reported, misconstrue the GOM's responses as a refusal to provide information, and thereby invent a gap in the record based on the GOM's supposedly incomplete responses.

In sum, the GOM clearly and fully explained why Commerce's *de facto* specificity questions requested information that was both inapplicable to the IBA program and not reportable. Thus, the GOM's response of "Not Applicable" to these questions was appropriate and fulsome. Moreover, the GOM provided Commerce with complete information related to its tax filing database, explaining why this database did not include IBA-specific usage information. Considering the GOM's fulsome responses, Commerce could not lawfully conclude that the GOM had withheld information, or that the record contained gaps related to the IBA program. Therefore, Commerce's decision to apply FA on these bases was unsupported by substantial evidence and unlawful.

### 4. Commerce Failed to Adhere to the Statute When It Countervailed the IBA Program Based on AFA

In finding that the IBA program was countervailable, Commerce deviated from its statutory obligations when it applied AFA. As noted above, to apply AFA, Commerce would have had to: (1) determine that the statutory criteria for the application of FA were fulfilled; and (2) make a separate finding that a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). In the Final Determination, Commerce never presented a finding that the GOM did not act to the best of its ability to respond to Commerce's requests regarding the IBA program. *See* Final IDM, at 3-4 and 14-15, P.R. 308. Rather, Commerce stated that it applied AFA to find the IBA program *de facto* specific because "the GOM withheld information that was necessary for Commerce to perform its specificity analysis for this program." Final IDM, at 15, P.R. 308. Even if the GOM had withheld information (which, as explained above, it did not), under the statute, this finding would permit Commerce to apply FA, not AFA. In stating that the GOM's alleged withholding of information warranted the application of AFA, Commerce impermissibly conflated the statutory criteria for FA and AFA. However, Commerce never articulated the separate finding required for the application of AFA—that the GOM did not act to

the best of its ability to comply with Commerce's requests for information.

Without this distinct finding, Commerce's decision to apply AFA is unlawful.

In any event, the GOM <u>did</u> act to the best of its ability to comply with

Commerce's requests for information about usage of the IBA program.  The GOM

provided Commerce with the text of the law establishing the IBA program

(Schedule 3 of the Income Tax Act of 1967) and explained that this capital

allowance was broadly available to "{a}ny company which fulfills the conditions"

articulated in that law.  *See* GOM SQR1, at 5-6, P.R. 140-158; *see also* GOM

IQR1, at 66, 69-71, P.R. 100.  The GOM also clearly and repeatedly explained that

the IBA program was a self-claimed tax allowance that did not involve any

separate application or approval process.  *See* GOM SQR1, at 6-7, P.R. 140-158.

It also clearly explained that it was impossible to segregate a filer's IBA claims

from its CA claims "without conducting a tax audit" for that filer, which means

that the GOM lacks program-wide usage information specific to the IBA program.

*See* GOM SQR1, at 6, P.R. 140-158.  These responses constitute a comprehensive

effort by the GOM to provide Commerce with the information that it needed to

conduct a specificity analysis.  Because the GOM acted to the best of its ability to

provide Commerce with this information, Commerce's application of AFA was

unlawful.

**B.    Commerce's Decision to Countervail the Sarawak Government Land Tax Program Was Not Supported By Substantial Evidence or In Accordance With Law**

**1.    Commerce Misinterpreted and Ignored Record Evidence When It Determined to Apply the Incorrect Analytical Framework to Assess the Alleged Benefit Conferred By the Sarawak Government Land Tax**

Commerce decided to disregard all record evidence that demonstrated the "land rent" paid by OMSA was a tax for one reason. Specifically, Commerce claimed that it "lack{ed} any official information, recognition, or supporting documentation from the GOM acknowledging that the {GOM} considers quit rent to be the equivalent of a land tax." Final IDM, at 12, P.R. 308. This conclusion, however, is not supported by fact or law. In the subsections below, OMSA demonstrates that a close review of the record shows official recognition and support by the GOM of the fact that the "land rent" was quit rent, and therefore a tax, and even if Commerce's claim were true, it cannot serve as a lawful basis to disregard record facts and engage in a gap-filling exercise.

### a. The GOM recognized and provided support for the fact that the "land rent" owed under the Sarawak Land Code qualified as quit rent, which by definition is a tax.

To illustrate Commerce's misinterpretation of the record and the fact that the GOM did affirm the land rent imposed under the Sarawak Land Code was a tax, OMSA outlines the record evidence related to the land rent in question.

On August 27, 2025, OMSA and Pertama submitted evidence that explained the land rent owed pursuant to the Sarawak Land Code was "quit rent", and that "{q}uit rent is a land tax imposed on owners of landed properties."  OMSA Rebuttal Benchmark Submission, at Exhibit BENCH-6, P.R. 218-220; *see also* Pertama's Land Submission, at Attachments 3 and 4 (providing definitions of "quit rent"), C.R. 220-222, P.R. 223-225.  Both submissions included documentation that expressly referenced Malaysia's quit rent as a land tax.  *See* OMSA's Rebuttal Benchmark Submission, at Exhibit BENCH-6, P.R. 218-220 (explaining quit rent, parcel rent, and assessment rates in Malaysia); *see also* Pertama's Land Submission, at Attachment 4, C.R. 220-222, P.R. 223-225 (stating that quit rent "is a tax or land tax" and "in other countries, such as Malaysia, quit rent remains an important means of raising revenue from landowners.").

In its Preliminary Determination, Commerce did not analyze the information placed on the record by OMSA and Pertama to determine whether the Sarawak land rent was a land tax, and did not opine on this issue, but noted that it would

further consider the information following the Preliminary Determination.  *See*

Preliminary IDM, at 15, fn. 91, P.R. 236.  After the Preliminary Determination,

Commerce issued one supplemental questionnaire to the GOM related to the

Sarawak land rent and the concept of "quit rent."  *See* GOM SQR4, P.R. 256-258.

In this questionnaire, Commerce included an umbrella introduction to the

questions, which cited to OMSA's and Pertama's submissions that defined quit rent

as a land tax and explained that the Sarawak land rent was quit rent.  *See* GOM

SQR4, P.R. 25-258.  As demonstrated below, Commerce prefaced its questions

with the umbrella introduction and asked the following:

1. OM Materials and Pertama Ferroalloys Sdn. Bhd (Pertama) reported that the bi-annual rent paid to the Sarawak Government is "quit rent."[7]  For the issue of "quit rent," please respond to each question below.

    a. Please explain/define the meaning of "quit rent" in Sarawak.
    b. Please provide the Malaysian law on "quit rent."  Please also provide any local government regulations or laws regarding quit rent in Sarawak.
    c. Please explain how "quit rent" rates are determined in Sarawak.
    d. Please explain if the local Government in Sarawak sets all "quick rent" rates.
    e. Please explain whether all companies in Sarawak pay "quit rent" or if companies only leasing or purchasing land from the local government pay "quit rent."
    f. Please explain why the "quit rent" rates for the respondents significantly increased in 2023.
    g. Further, please provide any government documentation regarding the increase in these rates.

GOM SQR4, P.R. 256-258.

The GOM responded to each of these questions with OSMA's and Pertama's

submissions on the quit rent as context.  In response to subparts a and b, the GOM

explained that the land rent established under the Sarawak Land Code was quit

rent, and the Malaysian law on quit rent was governed by the National Land Code and Chapter 81 of the Sarawak Land Code. *See* GOM SQR4 at 2, Exhibits I and II, P.R. 256-258. The GOM then responded to the other subparts of the question by explaining that: (1) the quit rent rates are established by land category and land grade and set under Section 30 of the Sarawak Land Code; and (2) since January 1, 1958, all holders of land title (with certain exceptions) are obligated to pay the quit rent. *See* GOM SQR4 at 4, P.R. 256-258; *see also* OMSA IQR1, at Exhibit LAND-2, C.R. 49-82, P.R. 85-99.

The GOM's responses—read in context with OSMA's and Pertama's definitions of quit rent—show that the GOM acknowledged the land rent charged under the Sarawak Land Code was quit rent, which was defined on the record as a land tax. *See* GOM SQR4, at 2-4, P.R. 256-258 ("Quit Rent is equal to Land Rent or Rent for Land (under Section 22 of the Sarawak Land Code)…"); *see also* OMSA's Rebuttal Benchmark Submission, at Exhibit BENCH-6, , P.R. 218-220; Pertama's Land Submission, at Attachments 3 and 4, C.R. 220-222, P.R. 223-225. In other words, the land rent was a land tax. Moreover, the GOM provided documentation and other excerpts of the law to support how the land tax was determined and who was subject to it. *See* GOM SQR4 at 2-4 and Exhibits I and II, P.R. 256-258.

Commerce's finding that it lacked any official information, recognition, or supporting documentation from the GOM acknowledging that the land rent was quit rent (*i.e.*, a land tax) was therefore unsupported and a misrepresentation of the record. The decision to treat the Sarawak land rent as the provision of a good instead of a tax therefore cannot stand.

### b. Commerce's disregard of record information that demonstrated the "land rent" qualified as a tax was unlawful.

Even if Commerce's interpretation of the GOM's responses was correct or reasonable (which it was neither), Commerce nevertheless engaged in an unlawful gap-filling exercise with respect to the Sarawak land rent program in the Final Determination. Commerce elected to disregard record information submitted by OMSA and Pertama which demonstrated unambiguously that the land rent in Malaysia was quit rent, and by definition, quit rent is a tax. In doing so, Commerce effectively and implicitly applied facts otherwise available ("FA") to OMSA. However, Commerce failed to adhere to any statutory requisites that would authorize it to apply FA. Consequently, Commerce's decision to disregard substantial record evidence was not lawful. OMSA details below how Commerce effectively applied FA when it disregarded record information, and why this application was unlawful.

Commerce has limited authority to disregard information on the record. Section 1677m(e) of the statute requires Commerce to use information on the record unless one of the following is true: (1) the information was not submitted by the established deadline; (2) the information cannot be verified; (3) the information is so incomplete that it cannot serve as a reliable basis for reaching a determination; (4) the party submitting the information did not act to the best of its ability; or (5) the use of the information would cause undue difficulties. 19 U.S.C. § 1677m(e)(1)-(5). Commerce does not contend nor does the record support a finding that any of these five criteria apply to OMSA, Pertama, or the information they submitted on quit rent and the Sarawak land rent.

Yet, Commerce still disregarded this information. In its Final Determination, Commerce never explained why any of the information submitted by OMSA and/or Pertama was insufficient to support a finding that the land rent was a land tax. This information included an article placed on the record by OMSA that focused on property ownership. *See* OMSA's Rebuttal Benchmark Submission, at Exhibit BENCH-6, P.R. 218-220. The article explained that in Malaysia, "quit rent is a land tax imposed on owners of landed properties," and that all landed property owners…must pay quit rent to the respective state governments." OMSA's Rebuttal Benchmark Submission, at Exhibit BENCH-6, P.R. 218-220.

Commerce never addressed why these statements (and other supporting documentation placed on the record by OMSA and Pertama) do not sufficiently demonstrate that the Sarawak land rent is quit rent, which is a land tax. Commerce simply disregarded the information under the pretense that the GOM did not provide information, recognition, or documentation to show that quit rent was a land tax. *See* Final IDM at 12, P.R. 308. Even if Commerce's belief with respect to the GOM's responses is correct, Commerce does not explain why this belief permits it to disregard the information submitted by OMSA and Pertama. Indeed, Commerce is obligated to review "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar*, 744 F.2d at 1562.

Moreover, as outlined in the section above, "Commerce can only use facts otherwise available to fill a gap in the record." *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348. Commerce may not apply FA "in disregard of information of record that is not missing or otherwise deficient." *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348 (quoting *Gerber Food (Yunnan) Co.*, 387 F. Supp. at 1288). Here there is no gap. The record sufficiently defines quit rent and explains that the Sarawak land rent is quit rent, which is a land tax. The record also includes multiple sources to support these facts.

However, Commerce seemingly alleges one gap—support from the GOM "acknowledging that it considers quit rent to be the equivalent of a land tax." Final

IDM at 12, P.R. 308.  To the extent that there is such a gap, the gap is the making

of Commerce and not the GOM or any of the respondents.  If Commerce wanted

an express statement from the GOM that quit rent is "the equivalent of a land tax,"

Commerce should have asked the question.  But it did not.  Commerce never asked

the GOM if quit rent is a land tax, nor did it ask if the Sarawak land rent was a land

tax.  Commerce *did* ask the GOM to explain the meaning of quit rent in Sarawak.

*See* GOM SQR4, at 2, P.R. 256-258.  And because the Sarawak Land Code does

not use the term "quit rent", the GOM explained that the land rent discussed within

Section 22 of the Sarawak Land Code was quit rent.  *See* GOM SQR4, at 2, P.R.

256-258.  Given the context in which Commerce provided this question (*i.e.*,

beginning the question by citing to OSMA's and Pertama's submissions that

provide a general definition of quit rent), the GOM provided a full response to this

inquiry.

Furthermore, to the extent that Commerce did request the GOM to explain

whether the Sarawak land rent (and quit rent in general) qualified as a land tax, and

found the GOM's responses deficient, it had the obligation to inform the GOM and

provide it with an opportunity to remedy or explain the deficiency in accordance

with 19 U.S.C. § 1677m(d).  "{F}ederal statute and Federal Circuit precedent

require Commerce to have provided notice and an opportunity to cure" a

deficiency before it can disregard information and apply FA.  *Saha Thai Steel Pipe*

*Pub. Co. v. United States*, 605 F. Supp. 3d 1348, 1369 (Ct. Int'l Trade 2022) (*citing* 19 U.S.C. § 1677m(d)); *see also Shelter Forest International Acquisition, Inc. v. United States*, 2022 WL 2155965 (Fed. Cir. Jun. 15, 2022). "A mistake or misunderstanding still requires notice of the deficiency and an opportunity to cure." *Saha Thai*, 605 F. Supp. 3d at 1369 (*citing Shelter Forest*, 2022 WL 2155965, at *5). It is Commerce's responsibility to "clearly and definitively ask for what it wants." *Saha Thai*, 605 F. Supp. 3d at 1363; *see also Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267 (Ct. Int'l Trade 1993) ("Commerce cannot expect a respondent to be a mind-reader.").

Commerce never informed the GOM of any deficiencies in its response. It only asked the GOM about quit rent in one questionnaire. To the extent Commerce found these responses unavailing or insufficient to determine the proper framework under which it should analyze the land rent owed under the Sarawak Land Code, Commerce was obligated by law to seek clarity from the GOM. Commerce did not.

In sum, Commerce's disregard of record information was not supported by law and its findings with respect to the land rent charged in Sarawak were not supported by substantial evidence.

> ### c. The Sarawak land rent was not countervailable because OMSA did not receive a benefit.

44

Had Commerce analyzed the Sarawak land rent program properly as a land tax, it would not be able to find the program countervailable.  OMSA did not receive a benefit.  The record demonstrates that OMSA paid the entire tax owed as prescribed under the law.  Because it paid the entire amount owed under the law, no benefit can be calculated.  *See* 19 C.F.R. § 351.509(a).  And without a benefit conferred, a program cannot qualify as a countervailable subsidy under law.  19 U.S.C. § 1677(5)(B).

### 2.  Commerce Relied on An Unlawful Benchmark When Measuring the Adequacy of Remuneration

Even assuming *arguendo* that Commerce properly analyzed the Sarawak Government land tax program as the provision of goods for LTAR (which, as explained above, it did not), the benchmarks that Commerce used to measure the adequacy of remuneration were unreasonable, in violation of 19 C.F.R. § 351.511.

Where an alleged subsidy involves the provision of goods or services by a government body for LTAR, Commerce's calculation of the benefit associated with that program must comply with 19 C.F.R. § 351.511.  This regulation governs the measurement of "adequate remuneration" and the comparison of that value to the value paid by the recipient for the relevant goods or services.  To conduct this comparison, Commerce will select certain values to serve as the benchmark(s) for "adequate remuneration."  Pursuant to 19 C.F.R. § 351.511(a)(2)(i), when

evaluating potential benchmark prices with which to compare the prices of the goods or services actually provided to the recipient, Commerce must "consider product similarity; quantities sold, imported or auctioned; and other factors affecting comparability."  When selecting a benchmark pursuant to these factors, Commerce must ensure that it selects a "reasonable benchmark that lacks distortive pricing."  *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1252 (Ct. Int'l Trade 2017).

In this investigation, to measure the adequacy of remuneration, Commerce compared the land tax payments made by the mandatory respondents with "industrial property commercial rental rates in Sarawak" as published in the CBRE Market Outlook 2023 Malaysia Real Estate Report.  *See* Preliminary IDM, at 15, P.R. 236. Commerce selected these industrial property commercial rental rates as the benchmark prices for its LTAR analysis.  However, these benchmarks are rental prices for buildings, not land.

The CBRE Market Report provided rental rates for "units" which are described in the report as mainly "semi-detached types."  *See* Memorandum from Stefan Smith, International Trade Analyst, Office I, AD/CVD Operations to The File, *Countervailing Duty Investigation of Ferrosilicon from Malaysia: Placing Benchmark Exhibits on the Record*, Case No. C-557-829 (Aug. 22, 2024), at Attachment p. 68 ("Commerce's Benchmark Memo"), P.R. 212; *see also* OMSA

Rebuttal Benchmark Submission, at 2 and Exhibit BENCH-1 through Exhibit

BENCH-5, P.R. 218-220.  For Bintulu, the CBRE Market Report stated

"{f}actories in Bintulu are mainly semi-detached types, making up 70% of

industrial property (722 units out of 1,000 units of existing stock).").  Commerce's

Benchmark Memo, at Attachment p. 68, P.R. 212.  The description of units in the

CBRE Market Report confirms that the rental prices are for factories and buildings,

not land.

Yet the land rent OMSA paid was for land only, not buildings.  Land and

factories are not comparable.  Thus, the "product" considered in the CBRE Market

Report is not comparable to the "product" on which OMSA pays the rent.

Given the lack of comparability between land and factory buildings, in

selecting these benchmarks, Commerce did not adequately consider the regulatory

factors.  Moreover, by selecting benchmark prices that were not comparable to

OMSA's experience, Commerce selected benchmarks that included distortive

pricing.  For both reasons, the benchmark rental rates selected by Commerce were

unreasonable and unlawful under 19 C.F.R. § 351.511(a)(2)(i); *see also CS Wind*

*Malaysia Sdn. Bhd. v. United States*, Slip Op. 25-149, Ct. No. 24-00079 (Ct. Int'l

Trade Dec. 5, 2025), at 13 (remanding Commerce's land benchmark determination

for failing to consider all record evidence on land rental rates in accordance with

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

19 C.F.R. § 351.511(a)(2)(i). Therefore, Commerce's selection of these benchmarks was not in accordance with the law.

The only rental rates on the record for land (*i.e.*, the product for which OMSA pays rent)—and thus the only benchmarks comparable to OMSA's experience and suitable under 19 C.F.R. § 351.511(a)(2)(i)—are the quit rent rates reported in the MIDA. *See* OMSA's Rebuttal Benchmark Submission, at Exhibit BENCH-5, P.R. 218-220. Commerce should therefore use these rates to calculate any benefit conferred should it continue to incorrectly analyze the land rent as a provision of goods for LTAR.[2]

Finally, to the extent Commerce's reliance on the unlawful benchmark is deemed lawful, the calculations Commerce used to calculate the benefit with this benchmark included errors that must be corrected on remand. Specifically, when calculating the [                              ] for the "Sarawak Government's Provision of Industrial Land for LTAR – Rental Rates", Commerce divided the [

                              ]. *See* Memorandum from Stefan Smith, International Trade Compliance Analyst, Office I, AD/CVD Operations to John McGowan, Program Manager, Office I, AD/CVD Operations, *Final Determination*

---

[2]    In the event the CBRE Market Report industrial building rental rates are considered comparable, Commerce must also include the factory rental rates reported for Sarawak in the MIDA when calculating the benchmark.

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

*in the Countervailing Duty Investigation of Ferrosilicon from Malaysia:*

*Calculations for OM Materials (Sarawak) Sdn. Bhd*., Case No. C-557-829 (Mar.

21, 2025), at Attachment II ("OMSA Final Calculations Memorandum"), C.R. 289,

P.R. 310.  Despite using the [                                        ], Commerce

labeled the calculated amount as [                                    ]. *See*

OMSA Final Calculations Memorandum, at Attachment II C.R. 289, P.R. 310.

This label, however, is not correct.  The amount calculated by Commerce actually

represents the [                                            ].  Nevertheless,

Commerce [


                            ] to calculate the benefit.  *See* OMSA Final

Calculations Memorandum, at Attachment II, C.R. 289, P.R. 310.  Commerce then

[

                            ]. *See* OMSA Final Calculations

Memorandum, at Attachment II, C.R. 289, P.R. 310.  By using this calculation,

Commerce never [

                    ] when it calculated the benefit.  Should Commerce continue to

use the unlawful benchmark to calculate OMSA's benefit, it must correct this issue.

   **C.    Commerce's Decision to Countervail the Import Duty Exemption
         for Imported Raw Materials Under the LMW Program Was Not
         Supported By Substantial Evidence**

## 1. Applicable Legal Standards

Commerce analyzes programs that involve the exemption of import charges on imported inputs used in subsequently-exported merchandise under 19 C.F.R. § 351.519.  Under this regulation, such exemptions do not provide a benefit, and therefore are not countervailable, if they: (1) extend only to inputs consumed in the production of exported product (with normal allowances for waste); and (2) do not extend to any charges other than import charges imposed on the imported inputs. *See* 19 C.F.R. § 351.519(a)(1)(ii).  To demonstrate that the exemptions extended only to import charges, and only applied to inputs consumed in the production of exported product, Commerce requires evidence that: (1) "the government in question has in place and applies" a reasonable and effective system "to confirm which inputs are consumed in the production of the exported products and in what amounts"; or (2) if the government lacks such a system or does not effectively apply it, the government "has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts."  19 C.F.R. § 351.519(a)(4)(i)-(ii).  To fulfill these standards, the government's system to confirm inputs consumed in exported products must also be "based on generally accepted commercial practices in the country of export."  19 C.F.R. § 351.519(a)(4)(i).

**2.  Commerce's Decision to Countervail the Import Duty Exemption for Imported Raw Materials Under the LMW Program Was Unlawful**

In its Final Determination, Commerce concluded that the full value of the import duty exemptions for imported raw materials under the LMW program were countervailable.  Commerce based this decision on a finding that the GOM had neither demonstrated that it: (1) maintained and applied a system described in 19 C.F.R. § 351.519(a)(4)(i); nor (2) that it performed an actual examination of imported inputs used in the production of exported products, in accordance with 19 C.F.R. § 351.519(a)(4)(ii).  *See* Final IDM, at 17, P.R. 308.

Commerce's finding that the GOM did not maintain and apply a reasonable and effective system—based on generally accepted commercial practices in Malaysia—to confirm the imported inputs used in the production of exported ferrosilicon is divorced from the record in this case.  As Commerce acknowledged and verified, OMSA was required to submit—and did submit—independently-audited compliance reports to the GOM, which included the information necessary for the GOM to track and confirm the inputs that OMSA had consumed in the production of exported ferrosilicon.  *See* OMSA IQR2, at Exhibit Import Duty SQA-1, at 5-6 and Exhibit Import Duty SQA-15, C.R. 183-98, P.R. 116. Specifically, OMSA submitted to the GOM: (1) independently-audited "monthly accounting{s} of all materials entered under the {LMW} program"; and (2) an

independently-audited "annual report on its relevant imports through the LMW."

OMSA Verification Report, at 9, C.R. 276, P.R. 278. The monthly reports

consisted of information pulled from OMSA's official customs declaration forms

(which, naturally, were also in the possession of the GOM). OMSA Verification

Report, at 9, C.R. 278, P.R. 282. The annual report was developed through the

aggregation of monthly information, and would be used "to determine whether the

company complied with all LMW requirements." OMSA Verification Report, at 9,

C.R. 278, P.R. 282. In short, under the system administered by the GOM, OMSA

was required to provide the GOM with the information needed to track and

confirm imported inputs used in the production of exported finished products.

Despite these findings, Commerce still countervailed the LMW duty exemption

program based on a finding that the GOM had not shown that it inspected or

confirmed the information submitted by companies to the GOM. *See* Final IDM,

at 17, P.R. 308. In particular, Commerce concluded that there was no information

on the record "which suggests that the GOM verifies, inspects, or does anything

with the independent auditor's report, other than merely accepting it." Final IDM,

at 17, P.R. 308.

Record evidence blatantly contradicts Commerce's conclusion. In its

submissions to Commerce, the GOM explained that it monitors duty-exempted

imported materials—and the exported merchandise produced using those

materials—by manually inspecting import and export documentation and cross-referencing it with the compliance reports submitted by companies. *See* GOM IQR1, at 83-85, P.R. 100. Specifically, the GOM explained that it performs the following "cross-checking measures": (1) the GOM inspects and verifies LMW license holders' import documentation "at the point of import" to ensure that the inputs for which a duty exemption is claimed appear on the license holder's list of approved inputs; and (2) the GOM inspects "each consignment of finished merchandise taken out from {the} LMW to be sold" and verifies the content of the license holders' export declaration forms. *See* GOM IQR1, at 83-84, P.R. 100. After inspecting the finished merchandise and export documentation, a GOM customs officer "will affix his stamp" to the export documentation as proof of inspection. GOM IQR1, at 84, P.R. 100.

Moreover, the GOM explicitly confirmed that it "**will** manually check" the actual factors and consumption data reported by companies receiving import duty exemptions under the LMW program by cross-referencing LMW license holders' import documentation to their audited compliance reports submitted to the GOM. GOM IQR1, at 85, P.R. 100 (emphasis added). This attestation <u>directly and incontrovertibly</u> refutes Commerce's assertion that the record lacks evidence of the GOM's actual inspection and verification of information submitted by LMW license holders. In addition, the GOM explained that it could further verify

information submitted by companies related to their imported inputs through on-site inspections.  *See* GOM IQR1, at 85, P.R. 100.

In supplemental submissions, the GOM reiterated and elaborated upon these points made in its initial submission.  For example, the GOM emphasized that its system for administration of LMW import duty exemptions required "{a}ny movement of goods {to} be recorded and/or endorsed" by a proper GOM customs officer.  GOM IQR2, at 3, C.R. 117-121, P.R. 120-125.  By confirming that appropriate customs officers "endorsed" the submitted information concerning imported inputs and exported finished merchandise, the GOM indicated that it did, in fact, review this documentation.  Further, the GOM explained that its customs officers "verifie{d} the information/declaration submitted by the LMW license holder company" in accordance with a formal set of standard operating procedures known as the "Perintah Tetap Kastam Bil. 27."  GOM IQR2, at 6, C.R. 117-121, P.R. 120-125.  Again, this record evidence shows that the GOM did far more with the customs documentation and compliance reports submitted by LMW license holders than "mere accept" them.

In sum, in finding that the GOM had not provided any evidence that it inspected or confirmed input tracking information submitted by companies, Commerce ignored significant information submitted by the GOM in its initial and supplemental questionnaire responses.  In doing so, Commerce failed to take the

entire record into account when assessing whether the LMW import duty

exemption program would be countervailable.  For this reason, Commerce's

conclusion that the LMW import duty exemption program was countervailable is

not supported by substantial evidence and is unlawful.

## V.    CONCLUSION

For the reasons explained above, Plaintiff respectfully requests that this

Court enter judgment on the agency record in its favor.


Dated: December 17, 2025              Respectfully submitted,

                                      */s/ Christine M. Streatfeild*
                                      Christine M. Streatfeild
                                      Justin R. Becker
                                      Lauren Shapiro
                                      Baker & McKenzie LLP
                                      815 Connecticut Avenue, N.W.
                                      Washington, DC 20006-4078
                                      Tel.: (202) 835-6111
                                      christine.streatfeild@bakermckenzie.com

                                      *Counsel to Plaintiff OM Materials*
                                      *(Sarawak) Sdn. Bhd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the attached Memorandum of Law in Support of Plaintiff OM Materials (Sarawak) Sdn. Bhd.'s Rule 56.2 Motion for Judgment on the Agency Record, filed December 17, 2025, contains 12,207 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 14,000 word count limitation set forth in the Scheduling Order issued by the Court on September 23, 2025 (ECF No. 28)

Dated: December 17, 2025          Respectfully submitted,

*/s/ Christine M. Streatfeild*
Christine M. Streatfeild
Justin R. Becker
Lauren Shapiro
Baker & McKenzie LLP
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Plaintiff OM Materials*
*(Sarawak) Sdn. Bhd.*